### In re PRIME COMMERCIAL CORPORATION, Debtor.

### Richard D. ELLENBERG, Trustee for Prime Commercial Corporation, Plaintiff,

v.

### THOSE CERTAIN UNDERWRITERS AT LLOYD'S SUBSCRIBING TO POLICY NO. ZKQ9200037/P1147–1–92, Defendants.

Bankruptcy No. 93–65598.
Adv. No. 94–6007.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Sept. 1, 1995.

---

Richard D. Ellenberg, Atlanta, Georgia, for plaintiff.

J. Robert Persons and M. Joseph Sterner of Lord, Bissell & Brook, Atlanta, Georgia, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

JAMES E. MASSEY, Bankruptcy Judge.

Prime Commercial Corporation is an additional named assured under policy no. ZKQ9200037/P1147–1–92 (the "Policy") issued by certain underwriters at Lloyd's of London (the "Underwriters"). The Policy covers losses arising from employee theft. In the first half of 1992, Prime made a series of highly questionable loans in transactions engineered by Patrick Wilson, who is its controlling shareholder and chief executive officer. By June 1992, other officers of Prime had become suspicious of the seemingly reckless loan transactions and were aware that Wilson had lied to them about certain aspects of those transactions.

In March 1993, Prime filed a voluntary petition under Chapter 7 of the Bankruptcy Code. In June 1993, its Chapter 7 Trustee made a claim under the Policy, asserting that Prime's losses on the questionable loans were due to thefts by Wilson. The Underwriters denied coverage, however, and the Trustee brought this adversary proceeding in which he seeks to recover losses due to the alleged thefts.

Each of the parties moves for summary judgment. The Underwriters are entitled to judgment dismissing the complaint for two primary reasons, each of which, standing alone, bars recovery by the Plaintiff. First, Wilson is not an "employee" for purposes of the Policy; consequently, his acts are not covered under the Policy. Second, when Prime filed its bankruptcy case, its claim under the Policy was already barred by the failure to give the Underwriters timely notice of the alleged loss.

### FINDINGS OF FACT

The parties do not agree on every fact. For example, the Underwriters dispute whether any theft occurred. Nonetheless, the parties agree on enough material facts to resolve the dispute on summary judgment motions.

#### A. Prime Commercial Corporation.

Incorporated in early 1992, Prime was in the business of factoring commercial accounts receivable. Patrick Wilson owned 80 percent of Prime's outstanding capital stock, and John S. Duke and KHD Deutz of America Corporation owned 13 percent and 7 percent, respectively, of the remaining capital stock.

Mr. Wilson served as Prime's president and chief executive officer. Robert Dye, Troy Childers and John Pulgin were senior

vice presidents of Prime, and Vern Bish was the secretary. The directors were Messrs. Wilson, Dye, Bish and Duke. Messrs. Wilson, Dye, Childers. and Pulgin conducted the day-to-day operations of the business. Prime was incorporated in Georgia and its principal place of business was in Georgia.

Wilson dominated the business of Prime. Although Prime had other directors, there is no evidence that they exerted any control over Wilson or Prime. In affidavits submitted by the Trustee in connection with these motions, Messrs. Dye, Pulgin and Childers testified: "Patrick Wilson had a very strong and domineering temperament...." In a memorandum dated June 26, 1992, prepared by Mr. Childers, he stated, "We, as senior officers, feel very uncomfortable in our present set of circumstances, because our President, Mr. Wilson, is conducting affairs in a *unilateral* manner without benefit of what we consider to be proper business techniques for 'due diligence,' particularly in view of the fact that the loan committee concept which we all agreed to employ, is being bypassed by Mr. Wilson." (Emphasis added.) In his brief filed on November 9, 1994, the Trustee admitted that Wilson controlled Prime and that "[t]here was nothing to require [Wilson] to comply with the rules that he could make and change." (Trustee's Brief Accompanying Motion for Summary Judgment, ¶ 14).

In an agreement dated March 2, 1992, American Alliance Corporation assigned to Prime its interest in a loan and factoring agreement with a North Carolina company called Blanton's College, Inc. In a related transaction, Prime entered into a loan and security agreement with KHD Deutz of America Corporation to borrow funds for Prime's factoring business. (*See* Exhibits to Affidavit of William J. Kohlmeyer attached to Plaintiff's Supplement To Exhibits To Statement Of Material Facts). That credit facility required Prime to maintain a fraudulent assigned accounts receivable insurance policy in the amount of five million dollars issued by Lloyd's of London and a fidelity bond in the amount of two million dollars also issued by Lloyd's.

B. *Issuance of the Policy.*

In January 1992, Mr. Duke, an insurance agent, sought to obtain for American Alliance Corporation an employee fidelity policy from Lloyd's of London. Mr. Duke dealt with a London insurance broker, Gibbs Hartley Cooper North American Limited. On January 21, 1992, Gibbs Hartley sent to Mr. Duke a facsimile of a term sheet and a specimen policy and stated in an accompanying memorandum that "once you fax confirmation of terms above will place 100% but in the interim no coverage is bound." (Exhibit A to Affidavit of John Duke attached to Plaintiff's Statement of Material Facts). The term sheet named "American Alliance Corp. & /or American Alliance Receivables Corp." as the assured and stated that KHD Deutz of America Corp. was an additional named assured.

The Trustee contends that this facsimile communication constituted a "cover note" and was the policy in effect at the time various acts of alleged theft occurred. He does so to argue that KHD could properly give a notice of loss under the Policy. At oral argument on June 12, 1995, however, the Trustee could not show that the insured had accepted Gibbs Hartley's offer. Thus, there is no evidence that shows the January 21, 1992 facsimile from Gibbs Hartley to Mr. Duke to be the policy at issue. Nonetheless, except for later changes in the named insureds and loss payees, the specimen policy and the Policy itself are identical in all essential respects.

On March 26, 1992, Gibbs Hartley communicated with Mr. Duke's company, International Risk, Inc., about the theft policy. It certified that KHD Deutz of America Corp. was a loss payee, not an additional named assured, and that it had added Prime as an additional named assured. (Exhibit H to Affidavit of William James Holley II, Plaintiff's Supplement To Exhibits To Statement Of Material Facts).

The Policy itself, a copy of which the Plaintiff attached to the complaint, was sent to the named insureds on July 7, 1992 at the earliest, (Affidavit of Christine McGuinness, attached as Exhibit A to the Underwriters Reply Memorandum), or on November 27,

1992, at the latest (Affidavit of John Duke). The Policy identifies American Alliance Corp. & /or American Alliance Receivables Corp. as the named assured. Endorsement Number 7 to the Policy added Prime as an additional named assured. Although the January 21, 1992 facsimile from Gibbs Hartley had described KHD Deutz as an additional named assured, the Policy in Endorsement Number 5 names KHD Deutz as loss payee, consistent with the March 26, 1992, communication from Gibbs Hartley. The term of the Policy was retroactive to January 23, 1992 and extended through January 23, 1993.

### C. The Alleged Acts of Theft.

Pursuant to the loan and security agreement between Prime and KHD Deutz, Prime borrowed the funds from KHD Deutz that it lent to its customers in factoring transactions. Prime also entered into a refactoring agreement with Barclays Commercial Corporation.

The Trustee asserts that over the period of a few months in 1992, Patrick Wilson engaged in several acts of theft from Prime. Those acts involved transfers of funds to four customers of Prime, Blanton's College, Inc., Bishopsgate Investment Group, Ltd., which was later called Bishops Group, Ltd., Trident Technology, Inc. and Markos, Inc. Wilson and principals of three of the four customers were friends before Prime made them loans.

1. *Blanton's College, Inc.* Blanton's College was in the business of training truck drivers. Shortly before Prime loaned Blanton's College over $400,000 in March 1992, the federal government and the states of North Carolina and Georgia terminated Blanton's College's participation in government backed student loan programs. The Trustee asserts that Wilson authorized these advances although Blanton's College had no new accounts receivable to factor. The Trustee contends that Wilson represented to KHD Deutz that Blanton's College was generating new receivables. At the time of the advances, Blanton's College had already closed one of its campuses and was on the verge of bankruptcy. Blanton's College never paid its debt to Prime.

The Trustee has not alleged or proved that Mr. Wilson knew that Blanton's College could not repay the loans or that Mr. Wilson received anything from Blanton's College in exchange for the loans from Prime. In his Second Supplemental Responses to the Defendant's First Interrogatories, the Trustee states only that Prime made an improvident loan to Blanton's College.

In support of his motion for summary judgment and in opposition to the Underwriters' motion, the Trustee submitted a transcript of a deposition of Patrick Wilson. There, Wilson denied committing thefts from Prime and denied any wrongdoing concerning the loans identified by the Trustee, including the loans to Blanton's College.

2. *Bishopsgate.* Prime advanced over $1,000,000 to Bishopsgate between April 14, 1992 and May 14, 1992 to factor purported accounts receivable from I.T.T., Incorporated, General Motors, Inc., Xerox Corporation, Proctor & Gamble, Inc. and Crestar Bank. Bishopsgate's representation that those receivables existed was false. Bishopsgate has not paid its debt to Prime. Bishopsgate's principal, David White, transferred $142,800 to Patrick Wilson shortly after Prime made the advances to Bishopsgate.

3. *Trident Technology, Inc.* Prime made an advance to Trident Technology on June 18, 1992, in the amount of $275,000, for the factoring of Trident's accounts receivable with Carter Construction Co., Lowe's Companies, Inc., WalMart Stores, Inc. and Home Depot, Inc. Shortly thereafter, Trident wired $100,000 back to Prime. It also wired $75,000 to an account in Wilson's name at Merrill Lynch in New York.

Trident had no accounts receivable to factor, and invoices it submitted to Prime were fraudulent. Trident has not repaid its debt to Prime.

4. *Markos, Inc.* Prime made an advance to Markos on June 17, 1992, in the amount of $165,000 for the factoring of Markos' account receivable with Sidus Systems, Inc. On June 19, 1992, Markos wired $162,500 of the $165,000 to a company called Mega Holdings. The Trustee asserts that the Markos invoice may be fraudulent, but he has been unable to

verify the authenticity of the Markos invoice to Sidus.

### D. *Officers' Knowledge of Wilson's Activities.*

There is no evidence that officers of Prime suspected any irregularity concerning the factoring arrangement with Blanton's College at the time of those transfers in March 1992. Beginning in April 1992, however, Messrs. Dye, Pulgin and Childers began to uncover facts about transactions instigated by Wilson that they found very disturbing. In the latter part of June 1992, they documented their suspicions and discoveries about various transactions in five typewritten memoranda.

In April 1992, Messrs. Dye, Pulgin and Childers discovered that Mr. Wilson had arranged to make a loan to Bishopsgate without committee approval and without having in hand the invoices to be factored. These acts violated Prime's standard policy and procedure for factoring accounts receivable, as well as industry standards. In April and May 1992, Wilson made over $1,000,000 in advances to Bishopsgate on invoices that were never reviewed by Prime's credit committee and were not available to Messrs. Dye, Pulgin or Childers for review. Wilson sent invoices from Bishopsgate's purported customers to Barclays, which had agreed to refactor receivables factored by Prime.

In May 1992, a Barclays loan officer told the three officers that those invoices referred to services rather than goods, were not addressed to a specific individual and gave no details concerning work performed. He informed them that the purported customers of Bishopsgate would never pay on those invoices and that Barclays would not refactor them. By late June 1992, Messrs. Dye, Pulgin and Childers knew that the Bishopsgate invoices were fraudulent. In July 1992, Mr. Duke, on Prime's behalf, filed a claim with the Underwriters under the fraudulent accounts receivable policy regarding the Bishopsgate invoices.

On June 18, 1992, Becky Do, Prime's records clerk, told Messrs. Dye and Childers that Mr. Wilson was about to advance $275,000 to Trident on invoices in her possession

that Mr. Wilson had asked her not to show to the other officers. Messrs. Dye and Childers immediately convened a meeting with Wilson. At that meeting, Mr. Wilson was asked whether he intended to advance the funds to Trident that day. Wilson told them that he did not intend to make a loan to Trident that day and assured them that he would make a full presentation on Trident to the credit committee later that afternoon. He then excused himself from the meeting for a moment, went to Prime's bookkeeper and records clerk and instructed them to wire $275,000 to Trident immediately. Later that day, Messrs. Dye and Childers discovered that Wilson had deceived them about the funding of Trident.

As outlined in a memorandum dated June 25, 1992, the officers decided to investigate the Trident invoices after the June 22 meeting with Wilson. They called several of Trident's purported customers and a trucking company identified on bills of lading accompanying invoices and discovered that the invoices and bills of lading were fabricated. They discovered that Trident had only recently been incorporated and had no listed telephone number.

On June 23, 1992, the three officers confronted Wilson to discuss their findings. Wilson asked them why they wanted to meet and said he was about to leave. The officers agreed that the matter could wait, but shortly thereafter, Wilson called Mr. Dye and asked why the officers wanted to meet with him. Dye told Wilson that the officers wanted to talk about procedures, particularly as they related to Trident. Wilson replied that he was under pressure to put out loans because KHD Deutz was about to pull the line and that there was nothing to worry about because he had personally verified the Trident invoices.

On June 24 or 25, 1992, the three officers confronted Wilson with the information they had discovered about Trident. Wilson's response did not explain the discrepancies or discount the possibility of fraud. Instead, Wilson stated that he would take care of getting the loan paid because one of the guarantors was wealthy. In a memorandum

dated June 30, 1992, the officers reported a meeting with Wilson on June 24, 1992. During the meeting, the memorandum states, the officers concluded that "[a]ll evidence to date indicated that these invoices were not legitimate and, if true, would constitute fraud by the client." The memo continues,

> Later, Patrick reported to Bob and Jack that some of the invoices were false but 'were submitted to make the advance look better'. When asked what was being done to get the money back Patrick said that 'he would take care of it!' Jack asked what he would do to 'take care of it?' He said one of the guarantors was very wealthy. Also, they had some 'legitimate' invoices they could submit.

(Memorandum of June 30, 1992 attached as Exhibit F to Underwriters' Memorandum of Law.) That memorandum also details discussions with Vern Bish in which Bish denied knowing invoices were fraudulent but stated that the risk was worth it in order to maintain KHD Deutz' funding of Prime.

On June 26, 1992, the officers learned that Mr. Wilson had also advanced $165,000 to Markos on June 17, 1992, despite Mr. Pulgin's request to Wilson that day not to make the advance and Wilson's assurance to Mr. Pulgin that he would not make the advance.

Mr. Childers testified at a deposition (Exhibit I, p. 51, attached to Underwriters' Memorandum of Law) that the officers sought the advice of independent legal counsel about their concerns and were advised that unless they could unequivocally state that a fraud had been committed, they were vulnerable to a defamation action. He stated that they felt like they were "between the rock and the hard place" and "didn't know basically what we should do." He further stated that they kept Mr. Duke informed about their findings and suspicions because they knew he was familiar with the Policy.

In response to the Defendants' summary judgment motion, the Trustee prepared and filed affidavits for Messrs. Dye, Pulgin and Childers, in which each of them disclaims knowledge that Wilson was a thief. In the affidavits, identical except for their names, they acknowledge prior deposition testimony that Wilson was dishonest but state that they were questioning Wilson's "veracity," not accusing him of being a thief.

### E. *Notice to the Underwriters.*

On July 29, 1992, John Duke notified Gibbs Hartley about a potential claim under the fraudulent accounts receivable insurance policy. The potential claim involved the discovery by Prime of fraudulent accounts receivable submitted by Bishopsgate. That notice did not mention the employee theft Policy, Blanton's College, Trident or Markos. The notice stated that the matter was likely settled because Bishopsgate had agreed to repay Prime for the false invoices submitted.

On December 30, 1992, counsel for KHD Deutz notified J. Robert Persons, counsel for the Underwriters, of "KHD's potential claim" on the Policy. On January 15, 1993, Mr. Persons advised counsel for KHD that in his firm's opinion, the Policy did not permit a loss payee to assert a claim and that the insureds were the proper parties to do so. He said that if the insureds made a claim in the manner prescribed by the Policy, the Underwriters would respond.

On January 22, 1993, John Duke wrote Mr. Persons that on behalf of American Alliance Corporation and Prime and "at the insistance [sic] of KHD Deutz of America Corporation we give notice of an incident which may give rise to a claims [sic] under the above captioned policy." On January 28, 1993, Mr. Persons wrote American Alliance and Prime that Mr. Duke's letter "does not comport with either the notice or proof-of-loss requirements of the policy." He referred the insureds to provisions in the Policy for giving notice of a loss and proof of loss.

On June 11, 1993, the Trustee wrote Mr. Persons to give "additional notice to the Subscribing Underwriters ... of claims...." The Trustee enclosed with the letter some deposition transcripts, pleadings in a suit brought by KHD Deutz against Prime, two affidavits and related motions and orders and briefs in that litigation, various credit line advance forms, bank records, cancelled checks and deposition exhibits.

F. *The Terms of the Policy.*

1. *Acts Covered.* The Policy furnishes two million dollars of coverage, with a deductible of $25,000 per loss, for

> direct losses of Money, Securities and other property caused by Theft or forgery by any identifiable Employee(s) of any Insured acting alone or in collusion with others.

(Policy, SECTION 1 INSURING CLAUSES, EMPLOYEE THEFT COVERAGE—INSURING CLAUSE 1, p. 2.)

2. *Definitions.* The Policy defines "Theft" as,

> the unlawful taking of Money, Securities or other property to the deprivation of the Insured.

(Policy, DEFINITIONS, p. 13.)

The Policy defines "Employee" as,

> one or more persons while in the regular service of any Insured in the ordinary course of the Insured's business during the term of this policy and whom any Insured compensates by salary, wages and/or commissions and has the right to govern and direct in the performance of such service; and shall also mean:
>
> . . . . .
>
> (C) any director or trustee of any Insured while performing acts coming within the scope of the usual duties of an Employee,
>
> . . . . .

(Policy, DEFINITIONS, p. 12.)

3. *Limitation on Losses Covered.* The Policy excludes coverage for any loss caused by an officer/employee—shareholder or in which they are implicated to the extent of the officer/employee—shareholder's proportionate interest. The Policy provides that,

> In consideration of the premium charged, it is hereby understood and agreed that with effect from inception of this Policy excludes the proportionate interest of any officer/employuee [sic]—shareholder in any loss caused by them or in which they are concerned or implicated.

(Policy, ENDORSEMENT NUMBER 3.)

4. *Termination of Policy Upon Discovery of Dishonest Act.* If an officer of an insured discovers an act of theft or other fraudulent or dishonest act by an employee, the Policy terminates as to that employee. The Policy states,

> This policy shall terminate as to any Employee (1) immediately upon discovery by the Insured, any partner of the Insured or any elected or appointed officer of the Insured (not in collusion with such Employee) of any act of Theft or other fraudulent or dishonest act by the Employee, without prejudice to the loss of any property then being conveyed by the Employee outside the Premises. . . .

(Policy, TERMINATION PROVISIONS, TERMINATION AS TO AN EMPLOYEE, p. 11.)

5. *Excluded Coverage of Employee Known To Be Dishonest.* Concerning exclusions for acts committed after an officer learns of an act of theft, fraud or dishonesty committed by the employee, the Policy provides,

> Coverage under Insuring Clause 1 does not apply to:
>
> . . . . .
>
> (B) loss caused by an Employee if an elected or appointed officer of the Insured possesses knowledge of any act or acts of Theft, fraud or dishonesty committed by such Employee: (1) in the service of the Insured or otherwise during the term of employment by the Insured, or (2) prior to employment by the Insured provided that such conduct involved Money, Securities or other property valued at $10,000 or more;
>
> . . . .

(Policy, SECTION 2 EXCLUSIONS, 2.2(B), p. 4.)

The Policy also states with respect to this provision that,

> For the purposes of this policy and the exclusions contained in Section 2.2(B), knowledge possessed by the Insured means knowledge possessed by a partner, director or an elected or appointed officer who is aware of the employment of a person and that person's prior acts of Theft, fraud or dishonesty.

(Policy, KNOWLEDGE OF PRIOR THEFT, p. 10.)

6. *Who May Give Notice.* Concerning who may give notice, the Policy provides,

Only the first named Insured shall have any right to claim, adjust, receive or enforce payment of any loss and shall be deemed to be the sole agent of the others for such purposes and for the giving and receiving of any notice or proof required to be given by the terms hereof and for the purpose of effecting or accepting any amendments to or termination of this policy. Each and every other Insured shall be conclusively deemed to have consented and agreed that none of them shall have any direct beneficiary interest herein or any right of action hereunder whatsoever and that this policy or any right of action hereon shall not be assignable; but knowledge possessed or discovery made by any Insured or by any partner or officer of any Insured shall constitute knowledge possessed or discovery made by all of the Insureds for the purposes of this policy. All losses and other payments, if any, payable by the Underwriters, shall be payable to the first named Insured, without regard to such Insured's obligations to others; and the Underwriters shall not be responsible for the proper application of any payment made. The Underwriters shall not be liable for loss sustained by one Insured to the advantage of any other Insured. If the Underwriters shall agree to and shall make payment to any Insured other than the one first named, such payment shall be treated as though made to the first named.

(Policy, JOINT INSURED, p. 6.)

7. *When Notice To Underwriters Must Be Given.* The Policy covers only those losses to the insureds (1) sustained during the policy term, (2) discovered during the policy term, and (3) reported pursuant to the notice requirements of the policy.

The Policy provides:

Coverage under this Section of this policy does not apply to:

. . . . .

(H) loss unless reported and proved in accordance with Section 4.5 hereof.

(Policy, EXCLUSIONS, ¶ 2.1(H), p. 4.)

The Policy does not contain a section denoted 4.5, however. The specimen policy broken down into subparts contains a section 4.5, entitled "NOTICE—PROOF—LEGAL PROCEEDINGS." This section in the specimen policy is identical to the section bearing the same caption in the Policy, except that word "Underwriters" replaces the word "Company." The Trustee conceded at the June 12, 1995, oral argument, and the court finds, that the exclusion in Section 2.1(H) of the Policy for "loss unless reported and proved in accordance with Section 4.5 hereof" refers to the Notice provisions in the paragraph on page 9 of the Policy entitled "NOTICE—PROOF—LEGAL PROCEEDINGS."

The Policy requires the insured to notify the Underwriters no later than sixty days after an officer of any insured obtains knowledge of or discovers a loss or an occurrence that might lead to a loss. It states,

Upon knowledge or discovery by a proprietor, partner or officer of any Insured of loss or of an occurrence which may become a loss, written notice shall be given at the earliest practicable moment, and in no event later than sixty days after such discovery. Within four months after such discovery the Insured shall furnish to the Underwriters affirmative proof of loss with full particulars. . . .

(Policy, NOTICE—PROOF—LEGAL PROCEEDINGS, p. 9.)

The Policy further provides that in any event the insured must give notice of such a discovery no later than sixty days after its termination. The Policy provides in pertinent part,

Coverage under this Section of this policy does not apply to:

. . . . .

(I) loss unless discovered and written notice thereof given to the Underwriters

within (1) sixty days following termination of this policy in its entirety.

. . . . .

(Policy, EXCLUSIONS, ¶ 2.1(I), p. 4.)

## CONCLUSIONS OF LAW AND DISCUSSION

### I.

A. *Jurisdiction.*

■ This court has jurisdiction to hear this proceeding under 28 U.S.C. §§ 157(c) and 1334(a) and (b) and pursuant to the Order of the United States District Court for the Northern District of Georgia entered on July 12, 1984, referring all the cases under Title 11 of the U.S.Code and all proceedings arising under Title 11 or arising in or related to a case under Title 11 to the bankruptcy judges of this district. This is a non-core proceeding because the adjudication of the rights and legal obligations of the parties under the Policy raises issues under state law that exist independently of Prime's bankruptcy case. Although the Policy may be property of the estate, the proceeds of the Policy are not. The parties have specifically consented to having this court decide this matter.

B. *Summary Judgment Standards.*

Pursuant to Fed.R.Civ.P. 56(c), incorporated in Fed.R.Bankr.P. 7056, a party moving for summary judgment is entitled to prevail if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of proof to establish that no genuine factual issue exists. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The movant must point to the pleadings, discovery responses or supporting affidavits which tend to show the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The court must construe this evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987).

The Underwriters argue that the Trustee cannot prove essential elements of his case and in such a situation there can be no genuine issue as to any material fact. They say that the Trustee cannot prove the essential elements that Wilson is an employee covered by the Policy, that the insureds gave timely notice of a claim, and that thefts from Prime occurred.

Where a showing is made by summary judgment motion that an essential element of the nonmoving party's case is missing, the nonmoving party must go beyond the pleadings and by affidavit or other kinds of evidentiary material must designate *"specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

Alternatively, the Underwriters move for partial summary judgment, contending that at least 80 percent of the claim is excluded from coverage under Endorsement Number 3 concerning an exclusion of a proportionate interest of an officer/employee—shareholder in any loss.

In his motion for summary judgment, the Trustee contends that Wilson is an employee under the Policy, that Wilson participated in thefts from Prime covered under the Policy, and that timely notice of loss and proof of loss were given.

C. *Applicable Law.*

■ Although this adversary proceeding arises in the context of bankruptcy, it raises no bankruptcy issue or other issue under federal law. The Policy itself contains no choice of law provision, and neither party has raised any issue about applicable law. Because most significant contacts relating to the Policy occurred in Georgia, the court holds that Georgia law applies. *Cf. Woods–Tucker Leasing Corp. v. Hutcheson–Ingram*

*Development Co.*, 642 F.2d 744, 748 (5th Cir. 1981).

■ The starting point for analyzing the issues raised by this case is Georgia law on insurance contract interpretation. These rules are not unusual. "The construction of an insurance contract is a question of law for the court. *Transamerica Insurance Co. v. Thrift–Mart, Inc.*, 159 Ga.App. 874, 880–881, 285 S.E.2d 566 (1981); O.C.G.A. § 13–2–1." *Hirschfield v. Continental Casualty Co.*, 199 Ga.App. 654, 405 S.E.2d 737 (1991). The words used in an insurance policy are to be given their plain, ordinary or popular sense, *National Union Fire Insurance Co. v. Prestige Helicopters, Inc.*, 217 Ga.App. 375, 376, 457 S.E.2d 587 (1995), and "must be read as a layman would read [them] and not as [they] might be analyzed by an insurance expert." *Jim Anderson & Co. v. Partraining Corp.*, 216 Ga.App. 344, 346, 454 S.E.2d 210 (1995). "If the terms of the contract are plain and unambiguous, the contract must be enforced as written.... If an ambiguity is present, the policy should be construed in favor of the insured and to provide maximum coverage." [citations omitted]. *Ryan v. State Farm Mutual Ins. Co.*, 261 Ga. 869, 872, 413 S.E.2d 705 (1992).

## II.

A. *Wilson Not An Employee.*

■ The Policy defines the term "Employee" as a person in Prime's regular service in the ordinary course of its business compensated by salary, wages or commissions whom Prime has the right to govern and direct in the performance of the service. The term includes "any director or trustee of any Insured while performing acts coming within the scope of the usual duties of an Employee."

■ The Underwriters contend that Prime could not govern and direct Wilson because he controlled, governed and directed Prime. The Trustee argues that Wilson fits the definition of Employee because the term includes a director performing the usual duties of an Employee. At the outset, it should be clear that merely because Wilson was a director does not mean his acts come within the "usu-

al duties of an Employee" unless in the performance of those duties, he otherwise met the requirement of the definition of "Employee." Wilson arguably met all of the criteria except the one identified by the Defendants: Prime's right to direct his work.

Backpedalling from his admission that Wilson controlled Prime, the Trustee argues that the control Wilson exercised was over other officers and employees and is inherent in the performance of duties of the chief executive officer of any corporation. The Trustee asserts that there must be total identity among shareholders, officers and directors for an alter ego theory to apply. He states that in Georgia, piercing the corporate veil requires misuse of the corporation, not simply wrongdoing by one officer. And, he contends that the alter ego doctrine in cases involving fidelity insurance policies is invoked to prevent the thief from recovering from his wrong and should not be applied to deny recovery that would flow to creditors of the wronged corporation.

■ It is true that "[u]nder Georgia law, a corporation and its shareholders and officers are separate, even if one person owns all of its shares and controls its actions." *United States v. Fidelity Capital Corp.*, 920 F.2d 827, 836 (11th Cir.1987). Courts permit creditors to pierce the corporate veil to reach individual assets when the corporate form is abused or disregarded. Nonetheless, the alter ego doctrine that the Underwriters invoke does not require the piercing of the corporate veil, and it does not require total identity of shareholders, directors and officers. As the Fifth Circuit noted in *Tow v. Wohl (Matter of World Hospitality Limited)*, 983 F.2d 650, 652 (5th Cir.1993),

> ... [T]here is a strong policy reason for denying the corporation coverage under the bonds in question. A corporation can only act through its officers and directors. When one person owns a controlling interest in the corporation and dominates the corporation's actions, his acts are the corporation's acts. Allowing the corporation to recover for the owner's fraudulent or dishonest conduct would essentially allow the corporation to recover for its own

fraudulent or dishonest acts. The bonds, however, were clearly designed to insure the corporations against their employee's dishonest acts and not their own dishonest acts.

The Trustee's argument that the court should be concerned with a policy to protect the rights of creditors misses the point that it is a contract we are interpreting. Cases involving fidelity policies are not about balancing the rights of creditors with the interest of an insurer not to pay a thief. They are about interpretation of contracts of insurance. The contractual obligation of the Underwriters was to insure only those regular, paid employees of the company in the normal course of business over whom Prime had "the right to govern and direct in the performance of such service." The issue is: did Prime control Wilson's performance?

■ The question of control cannot be answered in a mechanical manner such as by counting the number of directors on the board or by falling back on the theoretical ability of a corporation to direct an officer through a board of directors. In *Bird v. Centennial Ins. Co.*, 11 F.3d 228, 232 (1st Cir.1993), the court, in interpreting a policy with the same definition of the term "employee," held that an officer who owned 50% of the stock of one insured and 100% of the capital stock of a second insured was not an employee for purposes of the policy. *Bird* differed from this case in the detail that the officer and his wife were the only directors of the companies, and the wife owned the other 50% of the stock of one of the companies. Nevertheless, in an essential respect the cases are exactly alike. In *Bird*, as here, the plaintiff conceded that the officer in question was in complete control of the corporations, and the undisputed facts demonstrated that control. Rejecting a theoretical test of control, the court opined:

> With respect to plaintiff's first contention, we join those courts that have passed on the issue and reject the claim that the theoretical right to govern and direct a dominant corporate actor is sufficient to render that actor an employee under the

definition of employee set forth in the Policies. (Citations omitted.)

11 F.3d at 233.

■ By the same token, the mere fact that an employee owns a majority of shares of a corporation does not prove actual dominance. For example, in *Federal Deposit Insurance Corp. v. Lott*, 460 F.2d 82, 87 (5th Cir.1972), the Court of Appeals rejected the contention of the insurer that simply because a bank's president owned a majority of the bank's stock, he was not an employee. In *Lott*, the jury had determined that the board of directors did not abdicate its responsibilities, *Lott*, 460 F.2d at 88, and there is no hint in the opinion of any finding that the majority shareholder dominated the corporation.

The Trustee has conceded that no one controlled Wilson. The statements of Prime's officers that Wilson acted unilaterally while lying to them with impunity establishes the fact of his total dominance of the company. In his first brief, he stated, "Prime Commercial is a small entity controlled by the wrongdoer." (Plaintiff's Reply to Defendant's Motion For Summary Judgment, p. 21.) On page 13 of the Reply, the Trustee stated, "[t]here was nothing to require [Wilson] to comply with the rules that he could make and change."

The Trustee has failed to point to any evidence that Prime's board of directors exercised supervisory control over Wilson. The Trustee does note that Vern Bish was made a director to protect certain creditors and that Bish had to co-sign advance requests to KHD Deutz. Yet, he offers no proof that Bish did anything to direct or to restrain Wilson.

The Policy's definition of the term "Employee" leaves no doubt that coverage required an ability of the employer to control those working for it. "Nothing" required Wilson to adhere to any outside authority. Because Wilson dominated Prime, and no one connected to Prime restrained or controlled Wilson, Wilson was not an "Employee" for purposes of the Policy.

B. *Timely Notice of a Loss Not Given.*

1. *The Parties' Contentions Generally.*

The Underwriters argue that they have no liability because Prime failed to give them timely notice of a loss. The Policy required such notice within 60 days of discovery of the loss or an occurrence which may become a loss. The Underwriters contend that officers of Prime had sufficient knowledge to require notice in April 1992 or at least by June 1992, either because its officers discovered the alleged theft, should be deemed to have discovered the alleged theft or discovered dishonesty sufficient to shift all risk of future loss to the insured. No one notified the Underwriters about a loss until December 1992.

Relying on *American Surety Co. of New York v. Pauly,* 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898), in which the Supreme Court rejected an insurer's defense of untimely notice, the Trustee responds that Prime had a duty to give notice only upon discovery of theft, not on mere suspicions of theft or fraud. Because the officers did not have actual knowledge of thefts, the Trustee says that Prime had no duty to give notice to the Underwriters until December 1992, when KHD's counsel discovered Wilson's thefts.

The Policy requires that notice of loss be given at the earliest practicable moment upon "discovery by a proprietor, partner or officer of any Insured of loss or of an occurrence which may become a loss, ... and in no event later than sixty days after such discovery." (Policy, NOTICE—PROOF—LEGAL PROCEEDINGS, p. 9.) The parties spar over whether KHD Deutz was authorized to give notice under the Policy, but the case does not turn on this issue. Even if KHD had no right to give notice, John Duke, acting on behalf of American Alliance Corp. and Prime, wrote a letter dated January 22, 1993, to the Underwriters' counsel giving notice of a possible claim. If the first events giving rise to the requirement of giving notice had occurred in December 1992, as the Trustee contends by asserting that the alleged thefts were first discovered by KHD Deutz's attorneys in December 1992, this notice may have been timely.

2. *Analysis of Case Law.*

The seminal case of *American Surety Co. of New York v. Pauly,* 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898), deals with the question of when a duty to give notice under a fidelity policy arises. In that case, American Surety issued a fidelity bond to a bank insuring the honesty of O'Brien, a cashier. O'Brien turned out to be a thief; he aided the bank's president in stealing from the bank.

The thefts occurred on October 13 and 14, 1891. The bank folded in November of that year, and Pauly was appointed receiver on December 18, 1891. He continued to employ O'Brien until March 2, 1892. During 1892, bank examiners investigated the situation and, on May 23, 1892, they filed a report naming O'Brien as one of the culprits. On that same date, Pauly wrote a letter to American Surety to give notice of the claim.

Pauly sued when American Surety refused to pay the claim. One of the grounds on which the insurer defended was its contention that the notice of the claim was untimely. As a condition to liability of American Surety, the bond provided in part: "... the company shall be notified in writing, at its office in the city of New York, of any act on the part of the employe [sic] which may involve a loss for which the company is responsible hereunder, as soon as practicable after the occurrence of such act shall have come to the knowledge of the employer." *Pauly,* 170 U.S. at 136, 18 S.Ct. at 553–54.

The issue presented to the jury was whether the receiver had given the notice of the loss to the insurer "as soon as practicable." The trial judge charged the jury that suspicion of dishonest conduct alone did not require notice under the policy and that the receiver "was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act which might involve the defendant in liability for the misconduct." *Pauly,* 170 U.S. at 145, 18 S.Ct. at 557. The jury returned a verdict for the receiver, and American Surety appealed. The Court of Appeals affirmed, as did the Supreme Court.

The court rejected the contention of the appellant that the instructions given to the jury were erroneous.

We perceive no error in these instructions. They are entirely consistent with the terms of the contract. Much stress was laid, in argument, upon the words 'which may involve loss' in the above extract from the bond. But when those words are taken with the words in the same sentence, 'as soon as practicable after such act shall have come to the knowledge of the employer,' it may well be held that the surety company did not intend to require written notice of any act upon the part of the cashier that might involve loss, unless the bank had knowledge—not simply suspicion—of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty. It [sic] the company intended that the bank should inform it of mere rumors or suspicions affecting the integrity of O'Brien, such intention ought to have been clearly expressed in the bond.

*Pauly,* 170 U.S. at 147, 18 S.Ct. at 557–58.

*Pauly* continues to have vitality in the Eleventh Circuit. *F.D.I.C. v. Lott,* 460 F.2d 82, 87 (5th Cir.1972); *F.D.I.C. v. Aetna Casualty & Surety Co.,* 426 F.2d 729, 739 (5th Cir.1970).[1]

In *Aetna,* a bank employee, Steiner, had caused the bank to purchase notes for amounts and with maturities beyond the bank's authorization, in direct contradiction of instructions given to him by the Deputy Comptroller of the Currency. Steiner had also not disclosed to the Bank's minority directors that two other individuals, for whose interests in the bank Steiner was an undisclosed nominee, had received $189,-186.04 out of the purchase price of the notes. Over the vigorous dissent of Judge Godbold, the majority held that the facts did not establish that the notice of the fraudulent scheme given by the FDIC was untimely. The court held:

> The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice 'until he [has] acquired knowledge of some specific fraudulent or dishonest act which might involve the [insurer] in liability for the misconduct'. Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing. *American Surety Co. v. Pauly,* 170 U.S. 133, 144, 18 S.Ct. 552, 42 L.Ed. 977 (1898).

*Aetna,* 426 F.2d at 739.

In *Lott,* the bank's employee, Lott, made loans for amounts in excess to the bank's legal limit. Although the other directors were aware of some of those loans, Lott concealed others and did not tell the other directors about adverse examiners' reports concerning those loans. The policy required the insured to give notice of loss within 100 days of discovery. The insurer appealed a judgment based on an adverse jury verdict, contending that the facts showed that an officer or director not in collusion with Lott had discovered the dishonest or fraudulent acts more than 100 days before the notice was given. Citing *Pauly* and *Aetna,* the court said that "[n]otice is not required when the obligee merely suspects or has reason to suspect wrongdoing." *Lott,* 460 F.2d at 87.

### 3. *Whether The Policy Requires Knowledge of Theft.*

 Relying on the three officer affidavits and *Pauly* and its progeny, the Trustee contends that Prime was under no obligation to give notice to the Underwriters because the officers had only a suspicion of fraud, rather than actual knowledge of a theft. He points to the fact that they received advice from competent counsel that they risked a libel suit if they accused Wilson of theft and concludes that a reasonable person would not have charged Wilson with having committed a theft.

The Underwriters counter that the officers' knowledge of Wilson's dishonesty satisfies the *Pauly* test on which the Trustee relies. The Trustee responds that the word "dishonesty" as used by the *Pauly* court is limited to discovery of actual fraud or theft. He relies on *Perkins v. Clinton State Bank,* 593 F.2d 327, 334 (8th Cir.1979) in which the

---

**1.** The Eleventh Circuit has adopted the case law of the former Fifth Circuit as its governing body of precedent. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*).

Court of Appeals, citing *F.D.I.C. v. Lott*, 460 F.2d 82 (5th Cir.1972), stated, "mere suspicion of an insured loss by the injured is not sufficient to trigger the notice requirement."

 The defect in the Trustee's analysis is that the duty to give notice under a fidelity policy is a contractual duty, not a duty that the law defines without reference to the policy at issue. In *Perkins*, the policy required notice "[a]t the earliest practicable moment after Discovery of any loss hereunder." *Perkins*, 593 F.2d at 332. Here, the Policy requires not just notice upon discovery of a loss but upon discovery of "an occurrence which may become a loss." Rather than begin with general "rules" concerning notice, it is appropriate to begin with the Policy.

 The Policy is concerned not with any loss, but only with a loss occasioned by theft. Hence, if the Policy had required notice only upon the discovery of theft, it would have been sufficient to stop after the words, "[u]pon knowledge or discovery by a proprietor, partner or officer of any Insured of loss," as in *Perkins*, because knowledge of a loss is knowledge of a theft for purposes of the Policy.

 The discovery of a theft triggers the duty to notify, even if the insured believes that it may ultimately avoid a loss by recovering stolen property. The word "loss" in this context means damage or harm. The insured is damaged and suffers a "loss" for notice purposes the moment the thief unlawfully takes the property—not at the moment the insured concludes it cannot recover the property. It follows that the added words, "occurrence which may become a loss," cannot be read as requiring notice where the insured knows of a theft and believes that the theft "may" be a loss because it is not certain that stolen property will be recovered. Therefore, the added words, "occurrence which may become a loss," must refer to knowledge of some event or events short of actual knowledge of a theft that nonetheless requires notice to the insurer because that event may involve a loss by theft.

*Pauly* does not mandate a different result. There, the policy required notice of discovery of "an act ... which may involve a loss." The Supreme Court held that a duty to give notice under the policy did not arise until the insured had knowledge of "the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty." 170 U.S. at 147, 18 S.Ct. at 558. The Court's test did not require discovery of embezzlement to trigger the notice requirement. It used broader language, and its choice of words denote that the knowledge of chicanery required for notice was not limited solely to the type of dishonesty from which a loss could directly arise.

*4. What The Officers Knew And When They Knew It.*

In June of 1992, Dye, Pulgin and Childers knew that Wilson had lied to them concerning transactions involving large sums of money, leading the three officers to describe Wilson's conduct in affidavits and on deposition as "dishonest." Wilson's dishonesty was not about his age or golf score. He lied about the very transactions that the Trustee now claims were thefts instigated by Wilson. About these transactions, the three officers knew that they did not conform to company policy or industry norms and that certain invoices submitted by Trident and Bishopsgate were fraudulent as verified by the purported customers of the borrowers, prompting Prime itself to file a claim on the Bishopsgate transactions under the fraudulent accounts receivable policy in July 1992. They knew when they confronted Wilson with evidence of fraud that they were given no plausible explanation of the discrepancies. Instead, the officers were told that it was necessary to advance on illegitimate invoices so as to convince KHD to continue funding Prime's business. Thus, the officers knew that Wilson was dishonestly breaching Prime's agreement with KHD.

The officers suspected Wilson was a part of a scheme to steal money from Prime and that they recorded these suspicions in contemporaneous memoranda. As Mr. Dye stated in his deposition, "[w]e felt that Wilson was too close to his clients and that always leads to at least the suspicion that maybe that closeness has led to more than just a factor relationship.... he may have been a party to some misdeeds."

802

In *Aetna* and *Lott*, bank officials knew of irregularities and perhaps suspected wrongdoing but lacked any direct evidence of dishonesty. *Aetna*, 426 F.2d at 735–36, *Lott*, 460 F.2d at 84–5. In *Pauly*, there were rumors or suspicions about O'Brien's integrity, but the proof had to await the completion of the auditor's report. *Pauly*, 170 U.S. at 139, 18 S.Ct. at 554–55. Here, by contrast, the officers knew much more about Wilson's lack of integrity than Pauly knew about O'Brien's. Pauly may have suspected from February 1, 1891 that O'Brien had been dishonest as a bank employee, but Dye, Pulgin and Childers knew Wilson had been dishonest in dealing with them about some of the very transactions the Trustee now identifies as thefts and in his dealing with KHD Deutz.

▋ The advice the officers received from their own counsel does not prove that they lacked knowledge of essential facts or that Prime was somehow excused from giving notice. No judgment can be made on this record about the soundness of the advice because it is not clear what the officers told the attorney. The record is clear, however, that the attorney advised the officers about their own exposure to Wilson and not Prime concerning its rights and duties under the Policy.

### 5. *When Notice Was Due Under The Policy.*

▋ The Underwriters make two arguments concerning the issue of when a discovery of facts gives rise to a duty to notify. One contention is that Prime's officers had sufficient knowledge of the facts to be deemed cognizant of the alleged thefts. They rely on *Royal Trust Bank v. National Union Fire Ins. Co.*, 788 F.2d 719 (11th Cir.1986) for the proposition that where a person has sufficient knowledge of wrongdoing but no knowledge of actual fraud, a duty of inquiry arises such that he will be deemed to have knowledge of unknown fraudulent acts. In *Royal Trust*, the court merely approved jury instructions based on a definition of knowledge in the policy at issue, however. 788 F.2d at 720–21. It did not prescribe a rule for courts to follow in deciding when an insured is deemed to have sufficient knowl-

edge to require notice under any fidelity policy. Thus, cases such as *Royal Trust* interpreting different and more specific notice provisions offer little assistance in resolving the dispute in this case.

The other avenue of interpretation offered by the Underwriters is more productive. They refer to provisions in the Policy terminating coverage based not only on theft, but on dishonesty as well. They argue that discovery of dishonesty shifted the risk of future loss to Prime. The Underwriters assert that knowledge of potential loss requires notice, pointing, though in a somewhat unfocused way, to the risk shifting provisions.

▋ In analyzing the Policy, a useful approach is to ask what the purpose of notice is and when it would be reasonable for an insurer to expect notice and when it would be a burden on the insured to provide it. Then, equipped with an understanding of why it would be reasonable to expect and to give notice, one can profitably look at the specific notice provision in the context of the risks assumed by the Underwriters to answer the question of when notice is due.

▋ Notice of a loss under an insurance policy is notice of the possible liability of the insurer. Thus, the purpose of timely notice under a fidelity policy is to permit the insurer a suitable opportunity to exercise its rights under the policy, including the opportunity to limit its liability to the insured, to preserve evidence and to recover stolen property. *F.D.I.C. v. Aetna Casualty and Surety Co.*, 744 F.Supp. 729, 734 (E.D.La. 1990).

Although an insurer and insured could contract for notice under any circumstances they choose, it would not seem beneficial to either of them to require notice at the slightest suspicion of fraud. Otherwise, the insurer's cost of doing business would rise to cover the cost of investigating false alarms and of paying losses that might have been avoided if the occasional case of actual fraud had not been obscured by a mass of reported incidents.

▋ The insured also has an interest in not reporting every possible suspicion. If it

were required to do so, it would incur added costs, including higher premiums. Relationships of trust with employees would be damaged if every unexplained occurrence were subject to notice. It would suffer increased exposure to liability for defamation. Most states presumably provide a privilege for reporting events believed to be covered by fidelity policies. *See, e.g.,* O.C.G.A. §§ 51–5–7(2) and (3) ("Statements made in good faith in the performance of a legal or moral private duty" and "[s]tatements made with a good faith intent on the part of the speaker to protect his interest in a matter in which it is concerned" are privileged.) But, it is a qualified privilege and hence an insured's justifiable concern about litigation over malice or good faith.

Parties to a fidelity policy might rationally contract for notice in the absence of actual knowledge of theft or dishonesty, where, for example, a pattern of unexplained losses or the size of a possible loss makes it beneficial for both insured and insurer to be involved jointly in investigation of possible fraud. A loss that might exceed policy limits, for example, would be of interest not just to the insurer but to the insured as well. A pattern of losses that the insured has yet to pinpoint as fraudulent might be better analyzed by independent experts provided by the insurer.

■ The needs and concerns of insured and insurer suggest that the triggering of notice needs to be calculated to weed out as many false alarms as possible while permitting the insurer to participate in the investigation of conduct that a prudent person would recognize as illicit or corrupt. Regardless of the precise provisions to which the parties may agree and of their immediate concerns, the overriding purpose of notice remains: it is the catalyst that enables the insurer to manage the loss and possibly to reduce its exposure.

Loss after the fact is not the only risk the Policy addresses. Coverage of an employee terminates when a noncolluding officer discovers "any act of Theft or other fraudulent or dishonest act by the Employee...." (Policy, TERMINATION AS TO AN EMPLOYEE, p. 11.) Moreover, the Policy excludes coverage of loss caused by an Employ-

ee if an officer of the insured knows of acts of "Theft, fraud or dishonesty" committed during employment or prior to employment if the "conduct involved Money, Securities or other property valued at $10,000 or more." (Policy, Exclusions, ¶ 2.2(B), p. 4.)

These exclusion and termination provisions limit coverage because leaving a demonstrably dishonest person in a position to cause losses through dishonesty increases the risk beyond the point that the insurer believes it can make a profit on the premium charged. The outer limits of the type of dishonesty that will result in exclusion of coverage are not specifically defined, except with regard to prior employment, where dishonest conduct must have involved at least $10,000. Even if the Policy were not concerned with every deceitful, crooked, corrupt or mendacious act that an employee may have committed, it is plainly concerned with such acts that subject the insurer to substantially higher risk. By excluding or terminating coverage and thereby limiting the Underwriters' exposure to risk, these provisions serve a similar function to that of notice of discovery of a loss.

Once aware of an employee's dishonesty involving any situation in which a loss has occurred or might occur, an insured under these exclusion and termination provisions has a dilemma. If it fails to act, it risks an uninsured loss. The prudent employer faced with that prospect is likely to do one of two things: notify the insurer and seek clarification of coverage or remove the employee from a position to do harm. Either course of action conflicts with the factors that would make an employer reluctant to give notice of a loss without having proof of fraud.

Reluctant though a prudent employer might be to give notice to an insurer upon mere suspicion of fraud, prudent employers do not ignore such suspicions. Even the officers of Prime did not. A discovery that an employee has failed to follow company and industry procedures in dealing with customers close to that employee and that one of those customers has presented false documents in connection with large loans shouts for investigation.

As the analysis thus far has shown, the Policy may require notice upon discovery of an occurrence that is something less than discovery of actual fraud or theft. The Policy excludes coverage of an employee known to have been dishonest, whether before or after employment. The purpose of the exclusion and termination provisions is to limit the surety's exposure to liability due to a known risk. One purpose of the notice provision is to limit the surety's exposure to liability due to a known risk. The concerns of an insured that would cause it to be reluctant to give notice of a loss upon a mere suspicion of fraud, such as fear of a libel suit, largely disappear if the insured knows that the employee has been dishonest because it will absorb any future loss unless it acts. An employer who suspects fraud is likely to act on that suspicion.

■ Putting these pieces of the puzzle together reveals the picture. Discovery of an employee's dishonesty about incidents giving rise to a suspicion of fraud totally eliminates any compunction about giving notice without being able to prove fraud or theft. The escalation in risk of an uninsured future loss to the insured would parallel the increased risk to the surety that plunder from past thefts would be secreted or dissipated and that insured acts of unknown confederates would go undetected. The division of risk between insured and surety is no longer safe for either one, thereby generating significant overlapping economic interests in limiting potential losses. Thus, an occurrence which would terminate coverage is an occurrence which may become a loss, thereby requiring notice, if the operative fact is dishonesty manifested in connection with suspected fraud in transactions insured for the risk of dishonesty.

Like the issue concerning whether Wilson was an employee for purposes of the Policy, the issue concerning notice involves an unresolved question of Georgia law. There is no Georgia case interpreting a substantially similar policy provision. Hence, the court must determine what it believes the Georgia Supreme Court would decide if this case were before it.

■ Based on the foregoing analysis, the court holds that the following test applies. If an insured under a fidelity policy discovers an employee's dishonesty about business transactions that give rise to a suspicion of fraud, a duty of inquiry arises that cannot be satisfied by the undocumented assertion of the employee that no problem exists or if there is one, he will solve it. The failure of the insured to inquire promptly or the failure of the employee to respond promptly in a manner that would cause a reasonable and prudent person to put aside his suspicion of fraud triggers the duty to notify the surety under a policy requiring notice of discovery of an "occurrence which may become a loss" for theft or fraud. Cf. *City Loan and Savings Co. v. Employers' Liability Assurance Corp., Ltd.*, 249 F.Supp. 633, 658 (N.D.Ohio 1964) ("Knowledge or discovery of dishonesty does not depend upon knowledge of the total misconduct when viewed in retrospect and with the obvious advantages of hindsight, but rather upon knowledge of facts which, in the light of proven circumstances surrounding those facts and in the light of reasonable inferences which [may] be drawn from those facts, would inform the ordinary, reasonable and sensible employer that dishonesty has occurred which might involve the surety in liability." [citations omitted.] )

■ The Policy required Prime to give notice of an occurrence which may lead to a loss to the Underwriters "at the earliest practicable moment, and in no event later than sixty days after such discovery." (Policy, NOTICE—PROOF—LEGAL PROCEEDINGS, p. 9.) Nothing in Georgia law prohibits enforcement of such a provision. The parties to an insurance policy may make any agreement they mutually desire that is not forbidden by statute or public policy. *Fidelity & Deposit Co. of Maryland v. Sun Life Insurance Co. of America*, 174 Ga.App. 258, 260, 329 S.E.2d 517 (1985). Proving compliance with notice provisions of insurance policies is a condition precedent to recovery in Georgia. *See Protective Insurance Co. v. Johnson*, 256 Ga. 713, 352 S.E.2d 760 (1987); *Harris v. Towns*, 106 Ga.App. 217, 219–20, 126 S.E.2d 718 (1962).

Wilson's lies to fellow officers about irregular, large loans based on false documents constitute the sort of dishonesty in which an insurer under a fidelity policy and its insured would have a mutual and keen interest. Wilson's presentation of false invoices to KHD Deutz to make it appear that advances made by Prime were sound so as to induce KHD to continue to lend to Prime also constituted the kind of dishonesty with which the Policy is concerned. Hence, the officers' knowledge of Wilson's dishonesty would have terminated the Policy as to Wilson by the end of June 1992.

Dye, Pulgin and Childers made their discoveries of occurrences that might become losses by June 30, 1992, at the latest. Their actual knowledge of Wilson's dishonesty about seemingly corrupt and highly irregular transactions required Prime to give notice under the Policy. No reasonable person would have abandoned suspicions of fraud based upon Wilson's responses to the inquiries of Prime's other officers.

No one gave the Underwriters any notice of a claim or of an occurrence that might become a loss under the Policy until KHD's counsel's letter to the Underwriters' counsel on December 30, 1992, a lapse of about six months from the time Prime had enough information to give notice. Accordingly, because Prime failed to give notice within the 60 day period required by the Policy, the Underwriters are not liable to pay for the losses.

## C. *Timely Proof of Loss Not Given.*

 The Policy requires an insured to provide a proof of loss within four months after discovery of the loss or of an occurrence that may become a loss. The Trustee contends that the alleged thefts were discovered in December 1992. The court has found that Prime discovered an occurrence that might become a loss in June 1992.

On December 30, 1992, KHD's counsel sent a letter to Underwriters' counsel asserting the existence of a possible claim under the Policy. In a letter dated January 15, 1993, the Underwriters responded that KHD Deutz was not the proper party to give notice. That letter states in part,

The policy affords coverage to the entities insured against theft by their employees, as more fully explained in the insuring section and as modified by policy terms and conditions. Should an actual claim be asserted in a manner prescribed by the policy, we shall respond to that claim as appropriate.

The letter indicates that a copy was provided to counsel for American Alliance Corporation and Prime.

It was not until the Trustee's letter to Underwriters' counsel on June 11, 1993 that any entity provided the Underwriters with anything more than a statement to the effect that a "potential claim" under the Policy existed or there had been an incident that might give rise to a claim. In the December 30, 1992 letter from counsel for KHD Deutz to counsel for the Underwriters, there is a reference to a complaint and action for equitable relief previously delivered to Underwriters' counsel. Excerpts from that complaint are attached as Exhibit Q to the Underwriters' Memorandum of Law. Those excerpts discuss a scheme to defraud KHD, but they do not discuss a theft by an employee of Prime that led to a loss by Prime insured under the Policy. Thus, the first effort at identifying a theft from Prime was the Trustee's June 11, 1993 letter, almost one year after the discovery of occurrences that might lead to a loss and almost five months after counsel for the Underwriters reminded Prime and KHD about the need for a proper proof of loss.

Even if the Trustee's letter had been timely, it was not a proof of loss. Nothing in the record in this case shows that the documents sent by the Trustee to Underwriters' counsel disclosed details concerning the alleged thefts by Wilson. Indeed, the Trustee failed to respond properly to interrogatories of the Underwriters concerning the losses due to thefts, resulting in an order of this court entered on July 21, 1994 to compel the Trustee to respond. Even at oral argument, after the court had specifically directed counsel for the parties to show in the record what the undisputed facts were, the Trustee was unable to point the court to facts in the record

that proved a theft. Except for the three transcripts of depositions taken in another case in 1993, none of which establishes a theft, the Trustee did not use any of the materials enclosed with his June 11, 1993 letter to the Underwriters' to support his summary judgment motion.

The court holds that no insured provided the Underwriters with a proof of loss as required by the Policy. Even if the feeble effort at doing so had been sufficient, the documents purporting to comprise the proof of loss were submitted long after the time for doing so had expired. The alleged losses are therefore excluded from coverage under section 2.1(H) of the Policy.

### D. Disputed Facts Concerning Whether Losses Were Due To Theft by Wilson.

The Policy covers "direct losses of Money, Securities and other property caused by Theft or forgery by any identifiable Employee(s) of any Insured acting alone or in collusion with others." (Policy, SECTION 1 INSURING CLAUSES, EMPLOYEE THEFT COVERAGE—INSURING CLAUSE 1, p. 2.) A "theft" under the Policy is "the unlawful taking of Money, Securities or other property to the deprivation of the Insured." (Policy, DEFINITIONS, p. 13.) The Underwriters argue that the Trustee has failed to show that any "theft" took place.

Prime suffered losses in connection with its dealings with the four customers mentioned above. The question whether the losses were the results of theft, "taking" by Wilson that was "unlawful," remains disputed. If Wilson had been unaware that a customer had submitted false invoices, he might not have been involved in an unlawful taking as to that customer. If he knew that invoices were bogus and that a customer had no ability or intention of repaying, the transfers would have been an unlawful taking by Wilson, whether or not he personally received a dime from his co-conspirators. As the Trustee points out in his Second Supplemental Responses to the Defendants' First Interrogatories, Patrick Wilson denies having committed any theft. Yet, other evidence presented by the Trustee suggests that Wilson, Bishopsgate and Trident may have been involved in thefts from Prime.

The Trustee's statement of undisputed facts did not show that any theft had occurred with respect to the Blanton's College and Markos transactions. Although the Trustee showed how Wilson duped KHD into funding Prime's advances to Blanton's College, he did not show that Wilson was aware that Blanton's College had lost its accreditation or more importantly could not repay the debt.

The Trustee has failed to allege facts sufficient to characterize the Markos transaction as a theft by Wilson from Prime. Neither his statement of undisputed facts nor his description of the "theft" in his brief assert facts upon which the court could find that a theft had occurred. Rather, the Trustee alleges the invoice "may" be false. Furthermore, he fails to implicate Wilson in its fabrication or to impute knowledge of its fabrication to Wilson.

The Trustee has not shown the absence of a dispute about the facts of the Trident transactions. The Trustee asserts in his Second Supplemental Responses to Defendant's First Interrogatories that "[d]epending upon whom one chooses to believe, this was a theft by Patrick Wilson who knew the receivables were false and was merely covering up the transfer of funds, or a theft by the Hardin's and the Lowe's who duped Patrick Wilson with the false invoices, or a theft by all of said persons with the last option appearing to be the most probable." The Trustee has not amended his Second Supplemental Responses. The court accepts, as it must, the Trustee's own admission that issues of fact remain to be resolved.

The transfer from Trident to Wilson's Merrill Lynch account is troubling. That transfer considered in light of evidence submitted by the Underwriters that Wilson admitted knowing that the Trident invoices were false might be sufficient to support a finding of theft but for the Trustee's admission that a theft might not have occurred. The Underwriters offered no evidence to prove that Wilson was not involved in a theft.

There is no dispute here that David White on behalf of Bishopsgate gave Prime false invoices. In his Second Supplemental Responses to the Defendants' First Interrogatories, the Trustee's only reference to Wilson, other than identifying him as a witness with knowledge, is this sentence: "David White may have 'loaned' some monies to Patrick Wilson." In the documents submitted in support of the motion for summary judgment, the Trustee has shown that Wilson received transfers of funds from Mr. White shortly after Prime's advances to Bishopsgate and that those advances have never been repaid. The transfers from White to Wilson are as troubling as the Trident payment to Wilson, but without further evidence or a trial, the court cannot find that Wilson was involved in a theft merely because he had a business transaction with White shortly after Prime loaned money to Bishopsgate or because he was reckless in loaning money to Bishopsgate. For their part, the Underwriters introduced no evidence that proves a theft did not occur.

█ The Underwriters also argue that Prime suffered no loss because KHD Deutz has contended that the funds in question belong to it. That argument has no merit. The definition of the term "theft" requires only that there be a taking of money "to the deprivation of the Insured." If Prime obtained funds from KHD Deutz illegally, it was no less obligated to repay them than if it had legally borrowed the funds. Hence, it suffered a deprivation, whether or not it had legal title to the money.

The court concludes that neither side has shown the absence of disputed facts concerning the extent of Wilson's knowledge of the lawfulness of the transfers of funds from Prime to Bishopsgate and Trident, but that the Underwriters are entitled to summary judgment with respect to the Blanton's College and Markos transactions.

E. *No Exclusion of 80% of Losses Under Endorsement No. 3.*

█ Endorsement Number 3 provides: In consideration of the premium charged, it is hereby understood and agreed that with effect from inception this Policy excludes the proportionate interest of any officer/employuee [sic]—shareholder in any loss caused by them or in which they are concerned or implicated.

(Policy, ENDORSEMENT NUMBER 3.) The Underwriters suggest that Endorsement Number 3 means that coverage of a loss caused by an owner/employee is excluded to the extent of the ownership interest of the employee in the company. Under the Underwriters' reading, if a 50 percent owner of a company steals from the company, the Policy would exclude coverage of 50 percent of the loss. The argument seizes on the use of the word "shareholder" without paying attention to the rest of the sentence.

The Trustee points out that the words used by the Underwriters in the Policy refer to the employee's interest in a loss, not to the employee's interest in the insured. Under the Trustee's reading, the Underwriters would not pay the portion of the proceeds that would flow through to the employee/owner who committed the theft. If the insured is insolvent such that equity security holders would not receive any portion of the recovery, then there would be no exclusion under Endorsement Number 3.

Both parties profess that their reading of the Endorsement expresses its "plain meaning," but the Trustee's reading is far more compelling. To read the Policy as the Underwriters do would be to substitute the word "insured" for the word "loss." If the Underwriters meant to say "insured," they should have said "insured." The Endorsement appears to be designed to avoid paying the thief, not to avoid paying the insured because the thief owns a piece of the insured.

F. *Policy Effective At Time Of Transfers.*

█ The Policy terminated as to an employee upon the discovery by Prime or one of its officers of an act of theft, or other fraudulent or dishonest act. (Policy, TERMINATION PROVISIONS, TERMINATION AS TO AN EMPLOYEE, p. 11.) In addition, the Policy excludes from coverage losses caused by an employee if an officer of Prime "possesses knowledge of any act or acts of Theft, fraud or dishonesty committed by such

Employee: (1) in the service of the Insured or otherwise during the term of employment by the Insured,...." (Policy, SECTION 2 EXCLUSIONS, 2.2(B), p. 4.) The Underwriters argue that in April 1992, the officers discovered dishonesty sufficient to give rise to the notice provisions. The court finds that the evidence that the officers had such knowledge in April 1992 is inconclusive.

The evidence shows that Messrs. Dye, Pulgin and Childers first learned of Wilson's dishonesty on June 18, 1992, when they uncovered Wilson's deception regarding the Trident advance of $275,000 but, by that date, all of the transfers giving rise to alleged losses for theft had already occurred. Hence, on the basis of the record before the court, the Trustee's claim is not barred by discovery of dishonesty prior to the alleged thefts.

Based upon these Findings of Fact and Conclusions of Law, it is,

ORDERED that the Underwriters' motion for summary judgment is granted and the Trustee's cross-motion for summary judgment is denied.