**GULF USA CORPORATION,**
Plaintiff–Appellant,

v.

**FEDERAL INSURANCE COMPANY,**
Defendant–Appellee.

No. 99–35881.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 2001

Filed Aug. 7, 2001

██

David R. Lombardi, Givens, Pursley & Huntley, Boise, Idaho, Laurence May, John H. Drucker, Jeffrey K. Cymbler, Angel & Frankel, P.C., New York, New York, for the plaintiff-appellant.

Stephen R. Thomas, Moffatt Thomas Barrett Rock & Fields, Boise, Idaho, Frederick D. Baker and Joseph K. Powers, Sedgwick, Detert, Moran & Arnold, New York, New York, for the defendant-appellee.

Before: PREGERSON, THOMAS, and GOULD, Circuit Judges.

RONALD M. GOULD, Circuit Judge:

This case requires us to determine the standard for discovery of loss for purposes of notice under a fidelity policy. Gulf USA Corporation ("Gulf") sued Federal Insurance Company ("Federal"), seeking a declaratory judgment that Federal breached its obligations under the employee theft coverage clause of Crime Policy No. 80948166–D ("Crime Policy"). Gulf contended that Federal improperly denied coverage for losses Gulf sustained as a result of thefts allegedly perpetrated by a group of former officers and directors ("The Rowland Group") in connection with certain transactions of Gulf in New Zealand. The district court granted summary judgment to Federal, holding that Gulf discovered the loss on the New Zealand transactions not later than October 1991 rendering the Crime Policy inapplicable. Because the district court erroneously applied a discovery standard that conflicts with settled Supreme Court precedent, we reverse and remand for trial.

## FACTS AND PROCEDURAL BACKGROUND

The facts giving rise to the present action are tortuous and the truth may yet be obscured.

The Rowland Group[1] acquired control of Gulf in 1989 when Inoco PLC and its subsidiary purchased thirty-four percent of Gulf's common stock. David Rowland became president and chief executive officer

---

1. The Rowland Group consists of David Rowland, former president and chief executive officer of Gulf; Jeremy James, former director and executive vice president of Gulf; Derek Moran, former senior vice president of Gulf; and David Hudd, former director and executive vice president of Gulf.

of Gulf, while other members of the Rowland Group became officers and directors. At a Gulf board meeting in September 1989, Rowland suggested that Gulf invest in commercial real estate in New Zealand. Shortly thereafter, Gulf's board of directors authorized Rowland to commit up to [US]$50 million of Gulf funds as an equity investment in such real estate.[2]

Beginning in fall 1989, Gulf, through its subsidiary DeValdor, acquired the rights to twenty-four New Zealand properties. The New Zealand acquisitions involved two sets of purchase and sale contracts—one contract involved Felpark's sale of nineteen properties; the second contract involved Chase's sale of five properties. The Felpark contract provided for the sale of the nineteen properties to Gulf for [NZ]$122 million. The contract also provided for the payment to Felpark of a "procurement fee" of [NZ]$2.4 million for procuring the nineteen properties. Gulf also paid Felpark a two percent "finders fee," amounting to [NZ]$2.1 million, in connection with the Chase acquisitions.

One of the properties acquired under the Felpark contract was an office building known as the Unisys House. The Unisys House was owned by a corporation known as Sunflower Services Ltd., which was owned by Citibank. The equity in Sunflower consisted of 100 shares of ordinary stock, 100 shares of redeemable preferred stock, and the Unisys House. For the purchase price of [NZ]$43.94 million, the Unisys House and the Sunflower ordinary shares were transferred to a Gulf subsidiary. However, at the cost of one dollar, the preferred shares of Sunflower were transferred to Kingsley. Gulf then paid [NZ]$4.9 million to Kingsley to redeem the 100 shares of preferred stock.[3] Gulf recorded a total purchase price of [NZ]$48 million as its cost basis for acquisition of the Unisys House.

In January 1990, the Rowland Group began negotiating with City Realties Ltd. ("CRL")[4] for the purpose of merging CRL and DeValdor, which would effectively vest control of CRL in Gulf. As part of the merger process, CRL's chief financial officer, Rex Saunders, performed due diligence inquiries into the New Zealand properties to verify the costs Gulf incurred in acquiring its interests. During the course of his investigation, Saunders learned that Gulf paid Felpark [NZ]$4.5 million in fees and that Gulf paid Kingsley [NZ]$4.9 million to redeem the 100 shares of Sunflower preferred stock.

CRL also retained a New Zealand investment banking firm, Buttle Wilson Ltd., to obtain an opinion about the fairness and feasibility of the proposed merger. Regarding the New Zealand acquisitions, Buttle Wilson reported that Gulf had paid

---

2. Certain corporate relationships are central to the resulting real estate transactions. The basic relationships are as follows: Gulf wholly owned Gulfpac Ltd. Gulfpac wholly owned a New Zealand subsidiary, DeValdor Ltd. DeValdor, in turn, acquired subsidiaries that owned property. Two entities appeared between DeValdor and the entities that sold property to DeValdor. These two entities—known as Felpark Ltd. and Kingsley Finance Ltd.—received payment by virtue of the respective DeValdor purchases. At issue in this case is the contention that Felpark and Kingsley were shell corporations controlled by the Rowland Group, which were used to siphon money out of the New Zealand real estate transactions to the benefit of the Rowland Group.

3. Gulf's payment of the [NZ]$4.9 million to Kingsley was not direct: Gulf made a shareholders' advance to Sunflower of [NZ]$4.9 million and then these funds were paid to Kingsley when Sunflower redeemed the preferred shares.

4. CRL was later renamed and is now Gulf Resources Pacific Limited. When applicable, our opinion will continue to refer to the entity as CRL.

[NZ]$4.5 million in fees to third party companies and that "the estimated margin before holding and related costs accruing to the third party companies was up to [NZ]$7.3 million." As described in the Buttle Wilson report, the total amount paid to third parties was [NZ]$11.8 million, which equated to approximately [US]$7 million at the then-prevailing exchange rate. The report also stated that Buttle Wilson had received "written assurances by ... Gulf ... that the third party companies have no association or relationship with ... Gulf ... or any party related to [it]."

At the CRL shareholders' meeting convened to consider and approve the merger, a minority shareholder named Brierley Investments attempted to postpone the vote to ascertain the accuracy of the information contained in the Buttle Wilson report relating to fees paid to third parties. Brierley subsequently commenced an action in New Zealand courts in which it unsuccessfully sought to enjoin the CRL/Gulf merger on several grounds. Specifically, Brierley alleged that the entities who were paid fees were not unassociated or unrelated third party entities. In response to the denial of its request for an injunction, Brierley issued a press release stating that "given the [New Zealand] High Court did determine that there was a serious question on the issue of who in fact received the fees and margins totaling at least [NZ]$11.8M ..., [Brierley's] actions to date on this matter have been fully justified." The press release further noted that the "ultimate beneficiaries of these margins were not identified ... [and Brierley] intends to continue its investigations into the identity of the third party companies." Shortly thereafter, Gulf purchased

Brierley's CRL shares at twice the market value.

In May 1990, *Forbes* magazine published an article on Rowland and his relationship to Gulf. Entitled "Used and abused," the *Forbes* article recounted Brierley's opposition to the CRL/Gulf merger and the subsequent buyout of Brierley at "twice the market price." *Forbes,* May 28, 1990, at 71. The article alleged that "Brierley management suspected that Rowland took $7 million in improper fees and profits out of the [New Zealand real estate] deal...." *Id.*

After publication of the *Forbes* article, Gulf and its directors were named as defendants in a shareholder derivative suit. The complaint asserted that [US]$7 million in fraudulent fees had been paid to Rowland in conjunction with the New Zealand acquisitions. The derivative suit was voluntarily dismissed in 1991.

In early 1991, Nycal Corporation, led by Graham Lacey, entered into negotiations with the Rowland Group and Inoco to acquire their controlling interest in Gulf.[5] On July 12, 1991, the Rowland Group sold its controlling interest in Gulf to Nycal and resigned as officers and directors. Lacey became president, chief executive officer, and a director of Gulf.

Within days of the takeover, Lacey launched an investigation into the suspected fraudulent transactions engineered by Rowland during Rowland's tenure at Gulf. Lacey suspected that Rowland had defrauded Gulf and CRL on a transaction known as the "Kidderminster" acquisition, an industrial site located in England that had been purchased by a subsidiary of CRL for 9 million. At a Gulf board meeting on August 7, 1991, Lacey reported that

---

**5.** For additional background relating to Nycal's purchase of the majority interest in Gulf, see *Nycal Corp. v. Inoco PLC,* 949 F.Supp. 1115 (S.D.N.Y.1997), *Nycal Corp. v. Inoco PLC,* 968 F.Supp. 147 (S.D.N.Y.1997), and *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296 (S.D.N.Y.1997).

Kidderminster had previously been acquired from a receiver by a third party and was resold to CRL two months later for double the price. The minutes of the board meeting state that "based on circumstantial evidence developed to date, ... it is entirely possible the Kidderminster acquisition was a related party transaction." In a memorandum dated August 20, 1991, Lacey reported to the Gulf board that the "acquisition of the Kidderminster property is an outrageous fraud on [CRL], Gulf and their respective shareholders." The memorandum identified several other suspected fraudulent transactions. Lacey's memo concluded that "Gulf and its subsidiaries have been consistently looted by Rowland and his mob," and recommended that Gulf commence a lawsuit against Rowland "if, having presented Rowland et al with the facts and evidence, they do not within 48 hours make full and adequate recompense."

During this period, Lacey asked Peter Wall, the chief executive officer of CRL, to furnish details on additional suspected frauds committed by Rowland. In a memorandum to Lacey dated August 28, 1991, Wall recounted the circumstances surrounding the New Zealand acquisitions and the allegations by Brierley regarding the fees paid to third party entities. Specifically, Wall stated that Brierley "believed shareholders had not been told the full story about the companies that acted as intermediaries when Gulf bought its properties and took an $11.8 million cut on the transaction." Wall characterized these fees as "rake-off" in the memo.

In early September 1991, Lacey met with Rowland to discuss a settlement of Gulf's claims against Rowland. At a September 17, 1991 meeting of Gulf's board, Lacey outlined his discussions with Row-

land. In late September 1991, Gulf agreed to settle with Inoco and the Rowland Group. The terms of the agreement included the transfer of the Kidderminster property to Inoco for securities and cash in an amount equal to Gulf's full investment in Kidderminster and a general release [6] of Gulf's claims against Inoco and its officers.

Approximately six months after Gulf's settlement with Rowland, Gulf submitted to Federal a renewal application for the Crime Policy. In the renewal application, under a section entitled "Loss Experience," Gulf responded to a request to list "all employee dishonesty, burglary, robbery, disappearance, destruction and forgery losses discovered by the Insured in the last six (6) years" by answering "none." Federal renewed the Crime Policy, and it became effective on April 22, 1992.

By letter dated May 5, 1993, Gulf provided Federal notice that "[o]n March 8, 1993, employees of a Gulf ... subsidiary ... obtained information which indicates that a subsidiary of Gulf ... may have suffered a loss by virtue of an unlawful taking of money by an employee to the deprivation of Gulf ... or its subsidiary." The "employees" referred to in this letter—Wall and Saunders—stated that on March 8, 1993, they met with a senior bank officer of Citibank who informed them that Citibank had received approximately [NZ]$43 million for the Unisys House transaction, as opposed to the [NZ]$48 million recorded as Gulf's cost basis.

Gulf filed a proof of loss on October 27, 1993, which claimed that Felpark and Kingsley were "shell corporations created in the Cook Islands at [the Rowland Group's] direction immediately prior to the

---

**6.** Lacey reported to the Gulf board that "Rowland insisted upon a general release from any potential future claims based on the former management's actions during their tenure with [Gulf]."

transactions." The proof of loss further claimed that the fees paid to Felpark in conjunction with the New Zealand acquisitions and the funds paid to Kingsley as part of the Unisys House transaction had been routed through those corporations to Interallianz Bank of Zurich ("IBZ"). Although Gulf alleged that the funds were transferred at the direction of the Rowland Group, it cautioned that the "identity of the recipient accounts, and the legal and beneficial owners thereof, have not been determined." After a year-long investigation, Federal confirmed the factual allegations contained in Gulf's proof of loss. However, Federal denied coverage because it concluded that Gulf had materially breached the terms of the Crime Policy. Gulf then filed the present action.[7]

Federal moved for summary judgment, asserting three grounds. First, Federal alleged that Gulf's notice of its loss was untimely under the Crime Policy because Gulf knew of Rowland's fraudulent conduct no later than October 1991, but failed to notify Federal until May 5, 1993. Second, Federal contended that Gulf misrepresented its loss history in its Crime Policy renewal application by failing to disclose its prior discovery of Rowland's fraud. Third, Federal maintained that the release Gulf provided to Rowland destroyed Federal's subrogation rights in violation of the Crime Policy.

Federal submitted deposition excerpts taken from two unrelated matters, but primarily from *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296 (S.D.N.Y.1997). Gulf moved to strike the *Nycal* depositions, but the district court denied the motion. The district court granted Federal's motion for summary judgment, holding that "there are no genuine, disputed issues of material fact that by October of 1991, Graham Lacey had actual knowledge of events sufficient to trigger Gulf's obligation under the Crime Policy to notify Federal that the New Zealand acquisitions may have involved a loss by theft." The district court rejected Gulf's contention that Federal was due notice only after Gulf learned of a an actual theft. Relying on *Ellenberg v. Underwriters at Lloyd's (In re Prime Commercial Corp.)*, 187 B.R. 785, 801 (Bankr.N.D.Ga.1995), the district court held that "Gulf was required to give Federal notice once it possessed knowledge 'of some event or events short of actual knowledge of a theft that nonetheless ... may involve a loss by theft.'" The district court granted summary judgment to Federal and dismissed the action.[8]

This appeal followed.

## DISCUSSION

### I

■ This is a diversity action in which the factors relevant to the choice of law analysis favor the forum state. *See Indus. Indem. Ins. Co. v. United States*, 757 F.2d

---

**7.** This action was originally commenced as an adversary proceeding in Gulf's Chapter 11 bankruptcy proceeding brought in the United States Bankruptcy Court for the District of Idaho. In a decision dated October 26, 1995, the bankruptcy court found that Gulf's claims against Federal constituted a non-core proceeding pursuant to 28 U.S.C. § 157(b)(2). Thereafter, Federal filed a motion in the United States District Court for the District of Idaho seeking withdrawal of the reference of the action from the bankruptcy court to the district court and transferring venue to the

United States District Court for the District of Massachusetts. On April 4, 1996, the district court denied Federal's motion to transfer venue as well as its motion for an immediate withdrawal of the reference. On November 6, 1998, the district court entered an order withdrawing the reference to the bankruptcy court.

**8.** The district court did not address the remaining two grounds asserted by Federal in support of its motion for summary judgment.

982, 986 (9th Cir.1985). We therefore apply Idaho substantive law. *Stone v. Millstein,* 804 F.2d 1434, 1438 (9th Cir.1986).

 We review a grant of summary judgment de novo. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999). Viewing the evidence in the light most favorable to Gulf, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* To survive a motion for summary judgment, Gulf must present specific facts establishing a genuine issue on all essential elements of the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II

 Gulf contends that the district court erroneously considered sworn deposition testimony taken in an unrelated case. Gulf asserts that the district court erred "by basing its factual findings on the statements of ... Lacey when: (a) those statements were made in an unrelated matter in which neither Gulf nor Federal was a party; (b) the testimony would not be admissible at trial; (c) the statements were not based upon his own knowledge; (d) the testimony was internally inconsistent and contradictory; and (e) substantial contrary testimony existed in the record...." Despite this assertion of error, Gulf provides no argument or authority as support. We deem this issue to be abandoned. *See Am. Int'l Enters. v. FDIC,* 3 F.3d 1263, 1266 n. 5 (9th Cir.1993) (issue mentioned in "statement of issues," but not fully developed in argument, may be considered abandoned).

 Even were we to consider the merits, alternatively we hold that Gulf's assertion of error is without merit. Sworn deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was tak-

en in a separate proceeding. *Curnow v. Ridgecrest Police,* 952 F.2d 321, 324 (9th Cir.1991). Such testimony is considered to be an affidavit pursuant to Federal Rule of Civil Procedure 56(c), and may be used against a party on summary judgment as long as the proffered depositions were made on personal knowledge and set forth facts that were admissible in evidence. *Id.* The depositions challenged here satisfy this rule. *See Nycal,* 988 F.Supp. at 300 (Lacey and Rowland deposition testimony deemed to be sworn, based on personal knowledge, and set forth facts admissible in evidence).

## III

Gulf contends that the district court erroneously concluded that there was no genuine dispute that Gulf "discovered" the theft loss no later than October 1991, thereby precluding it from recovering under the Crime Policy. Specifically, Gulf argues that: (1) the district court's decision "is based largely on inferences, improperly drawn in Federal's favor"; (2) the district court adopted a discovery standard "which is at odds with almost one hundred years of well-established case law"; and (3) the district court's reading of the Crime Policy was flawed.

Our review begins with the language of the Crime Policy. The Crime Policy affords "Employee Theft Coverage" to Gulf up to a limit of [US]$10 million, subject to a [US]$100,000 deductible. The policy provides: "The Company shall be liable for direct losses of **Money, Securities** and other property caused by **Theft** or forgery by any identifiable **Employee(s)** of any Insured acting alone or in collusion with others." (Emphasis in original). The policy defines "Theft" as "the unlawful taking of **Money, Securities** or other property to the deprivation of the Insured." (Emphasis in original). There is no dispute that

the alleged actions of the Rowland Group regarding the New Zealand acquisitions constitute a "theft" under the Crime Policy.

In general, the Crime Policy covers loss discovered and sustained both after the inception date of the policy (April 22, 1992), and during the effective period of the policy. The Crime Policy also provides limited coverage for loss sustained before April 22, 1992: "The liability of the Company for loss sustained prior to ... the effective date of this policy ... is subject to [the condition that] ... the loss shall have been discovered after the expiration of the time for discovery of such loss under the last such bond or policy."[9]

As to notice of such loss, Section 4.5 of the Crime Policy provides:

Upon knowledge or discovery by a proprietor, partner or officer of any Insured of *loss or of an occurrence which may become a loss*, written notice shall be given at the earliest practicable moment, and in no event later than sixty days after such discovery. Within four months after such discovery the Insured shall furnish to the Company affirmative proof of loss with full particulars.

(Emphasis added). The Crime Policy also states that "knowledge possessed or discovery made by any Insured or by any ... officer of any Insured shall constitute knowledge possessed or discovery made by all of the Insureds for the purposes of this policy."

The parties agree, and we also conclude, that these provisions establish that Gulf may recover for its theft loss under the Crime Policy only if it first discovered the loss after the April 22, 1992 inception date of the Crime Policy. To determine whether the Crime Policy is applicable, the central issue is the definition of "discovery of loss" under the policy.[10]

In granting summary judgment to Federal, the district court relied on *Prime Commercial* and reasoned:

In that case, the court correctly observed that "the Policy requires not just notice upon discovery of a loss but upon discovery of 'an occurrence which may become a loss.'" Since a crime policy is concerned only with a loss occasioned by a theft, the *Prime Commercial* court reasoned that "if the Policy had required notice only upon the discovery of theft, it would have been sufficient to stop after the words, '[u]pon knowledge or discovery by a proprietor, partner or officer of any Insured of loss,' ... because knowledge of a loss is knowledge of a theft for purposes of the Policy." Based on this reasoning, the court concluded:

"It follows that the added words, 'occurrence which may become a loss,' cannot be read as requiring notice where the insured knows of a theft.... Therefore, the added words, '*occurrence which may become*

---

**9.** Before obtaining coverage under the Crime Policy at issue here, Gulf was insured under another Federal crime policy ("prior policy"), which was effective until April 22, 1992. Although the prior policy was in effect when Gulf sustained its loss from the Rowland thefts, Gulf has made no claim under the prior policy. Thus, if Gulf first discovered the Rowland thefts during the prior policy period, the Crime Policy would not afford coverage for such loss.

**10.** The Crime Policy does not define the term "discovery." Idaho courts have recognized that, "where a word or phrase used in an insurance contract has a settled legal meaning or interpretation, that meaning or interpretation must be given even though other interpretations are possible." *Stein–McMurray Ins. Inc. v. Highlands Ins. Co.,* 95 Idaho 818, 520 P.2d 865, 867 (1974); *see also Calif. Union Ins. Co. v. Am. Diversified Sav. Bank,* 948 F.2d 556, 563–64 (9th Cir.1991).

*a loss,' must refer to knowledge of some event or events short of actual knowledge of a theft that nonetheless requires notice to the insurer because that event may involve a loss by theft."*

This Court agrees with the *Prime Commercial* court's analysis, and adopts that court's interpretation of the "discovery" language as its own.

(Emphasis and alterations in original) (quoting *Prime Commercial*, 187 B.R. at 801).

Gulf contends that "discovery of a loss under a fidelity type policy requires actual knowledge by an insured of specific fraudulent or dishonest acts of an employee." Conversely, Federal contends that "once an insured has sufficient facts to reasonably question an employee's honesty, a purported delay in discovering a theft loss cannot be justified by the assertion that the insured did not have enough detailed information." Our precedent indicates that the proper standard falls in between these two positions.

■ It has long been established, under authority declared by the Supreme Court, that a loss is discovered once an insured has obtained facts that would cause a reasonable person to charge that there had been dishonesty or fraud resulting in loss. One of the earliest and most pivotal cases interpreting the phrase "discovery of loss" is *American Surety Co. v. Pauly*, 170 U.S. 133, 147, 18 S.Ct. 552, 42 L.Ed. 977 (1898).[11] There, in the context of an insurance policy that required the insured to notify the insurance company of a claim upon "discovery of the loss," the Supreme Court approved the following jury instruction:

It is not sufficient to defeat the plaintiff's right of action upon the policy that

it be shown that the plaintiff may have had suspicions of dishonest conduct. . . . He may have had suspicions of irregularities; he may have had suspicions of fraud, but he was not bound to act until he had acquired knowledge of some specific, fraudulent or dishonest act which might involve the defendant in liability for the misconduct.

170 U.S. at 145, 18 S.Ct. 552. The Court held that the insured was required to give notice to the insurer once it "had knowledge—not simply suspicion—of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty." *Id.* at 147, 18 S.Ct. 552.

■ Courts generally have followed *American Surety*, and its statement has become the "well-established rule." *See* L.C. Warden, *Effect of Failure to Give Notice, or Delay in Giving Notice or Filing of Proofs of Loss, Upon Fidelity Bond or Insurance*, 23 A.L.R.2d 1056, at § 6 (1952) (citing authorities relying on *American Surety*). We have applied it, albeit in a slightly different context, holding that under fidelity bond and California law, "discovery" occurs once an insured becomes aware of facts that would cause a reasonable person to assume a loss had been or would be incurred. *See Calif. Union Ins. Co.*, 948 F.2d at 563. In other words, "discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and *appreciates the significance of those facts;* suspicion of loss is not enough." *Id.* (emphasis added) (citing *F.D.I.C. v. Aetna Cas. & Sur. Co.*, 903 F.2d 1073, 1079 (6th Cir. 1990)). *See also, e.g., Resolution Trust Corp. v. Fidelity & Deposit Co.*, 205 F.3d 615, 630–31 (3d Cir.2000) (holding that "discovery . . . does not occur until the insured 'discovers facts showing that dis-

---

**11.** *See also American Surety Co. v. Pauly,* 170 U.S. 160, 164, 18 S.Ct. 563, 42 L.Ed. 987

(1898) ("*Pauly II*") (reaffirming the discovery standard enunciated in *American Surety*).

honest acts occurred and appreciates the significance of those facts'") (quoting *Calif. Union Ins. Co.*, 948 F.2d at 563); *F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1542 (10th Cir.1994) (noting that "[d]iscovery requires that the insured have more than 'mere suspicion' of loss"); *F.D.I.C. v. Aetna Cas. & Sur. Co.*, 426 F.2d 729, 739 (5th Cir.1970); *Nike, Inc. v. Northwestern Pac. Indem. Co.*, 166 Or.App. 312, 999 P.2d 1197, 1202–03 (2000) (noting that *American Surety* reflects the ordinary understanding of the term "discovery," and adopting it as the applicable standard). As a leading treatise has recognized, "[d]iscovery takes place when the insured gains sufficient knowledge, greater than mere suspicion, which would justify a reasonable and prudent person to believe that an act of dishonesty [or theft] and loss within policy coverage had taken place." Lee R. Russ & Thomas F. Segalla, *11 Couch on Insurance 3D* § 160:97, at 160–86 (1998) (footnote omitted).

Given the well-established adoption of the *American Surety* standard in our circuit and others, we must disagree with the district court's interpretation of the discovery rule. The district court's adoption of *Prime Commercial* created an unduly expansive discovery standard that conflicts with our precedent. We decline to follow *Prime Commercial* because its language would require notice when the insured simply possesses "knowledge of some event or events short of actual knowledge of a theft," *Prime Commercial*, 187 B.R. at 801, without providing adequate definition.

■ We also reject the interpretations of the discovery rule urged by both Gulf and Federal. Although Gulf contends that "actual knowledge of fraud" is required, this standard would encourage an insured unduly to delay reporting fraud or dishonesty, causing unnecessary loss. And while Federal contends that the discovery rule is satisfied when an insured simply has suffi-

cient facts to "reasonably question" an employee's honesty, this interpretation is too broad and would encourage premature accusations of employee misconduct. We reaffirm that *American Surety* and our precedent require "knowledge—not simply suspicion—of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty." *Am. Sur.*, 170 U.S. at 147, 18 S.Ct. 552.

The *American Surety* standard has stood the test of time and it also fares well when reexamined. This standard makes sense because a careful and prudent person does not lightly charge another with committing fraud or an act of dishonesty. Such charges may disrupt the fabric of the employer's workplace and may often set into motion further investigations by responsible governmental agencies and affected parties. If such a charge is later determined incorrect, the employer may be liable for defamation, slander, breach of contract, or other claims. For such reasons, it is reasonable to interpret the fidelity bond's contractual language in a manner permitting the employer to be careful and cautious before asserting that a fraud or dishonesty has occurred. *Cf. Utica Mut. Ins. Co. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 123 (2d Cir.1984) (noting that the adoption of a broader definition of discovery "would effectively eliminate the insured's duty to inquire into the facts").

■ Applying the objective *American Surety* standard here, and viewing the facts and all reasonable inferences in the light most favorable to Gulf, we hold that the district court erroneously determined that "there are no genuine, disputed issues of material fact that by October 1991, Graham Lacey had actual knowledge of events sufficient to trigger Gulf's obligation under the Crime Policy to notify Federal that the New Zealand acquisitions may have involved a loss by theft." After reciting

certain evidence in support of summary judgment, the district court stated: "This evidence establishes that Lacey *believed* Rowland had skimmed money off numerous Gulf transactions."[12] (Emphasis added). While Lacey may well have believed Rowland perpetrated various frauds during his tenure at Gulf, the evidence relied upon by the district court does not establish that Lacey had knowledge of sufficient facts to charge that the New Zealand acquisitions involved a theft loss.

The district court also found that the information Saunders learned on March 8, 1993 (the date Gulf claims it "discovered" its loss) "did not differ materially from information [Saunders] obtained during CRL's due diligence inquiry in 1990"—namely, that Citibank received approximately [NZ]$43 million for the Unisys House and not the [NZ]$48 million recorded as Gulf's cost basis. The district court further found that during his due diligence, "Saunders learned that Kingsley was a Cook Island corporation, that Kingsley had received the preferred shares of Sunflower Services *for no consideration,* and that the shares had been redeemed with [NZ]$4.9 million in Gulf funds." (Emphasis added). This is an improper inference that the record does not support. In fact, although Saunders received a report indicating the author's belief that "nothing was paid by Kingsley for the preference shares," Saunders testified that "I believe[ed] that they were making an assumption that they couldn't come to, based on what they had there."

When viewed in a light most favorable to Gulf, the evidence demonstrates that there are genuine, disputed issues of material fact as to when Gulf possessed knowledge of the existence of such facts that would justify charging Rowland with dishonesty, fraud, or theft. Because it is unclear when Gulf discovered facts indicating that the New Zealand acquisitions involved a loss by theft, we hold that the district court erroneously granted summary judgment to Federal. Instead, factual issues pertinent to discovery of loss require trial.

## IV

■■ As an alternative basis for affirming the district court's grant of summary judgment, Federal argues that the Crime Policy should be rescinded because Gulf failed to disclose pertinent loss history information in its renewal application form.[13] Specifically, Federal contends that there is no genuine issue of fact in dispute that Gulf failed to disclose its loss resulting from the Kidderminster transaction.[14] We disagree.

■■ Reviewing the record in the light most favorable to Gulf, as we must in

12. The district court also placed great emphasis on Lacey's *Nycal* deposition testimony, wherein Lacey stated that during the period "15th of July, 1991 and the end of September 1991 ... I *believed* that the ... fees and expenses that made up the total cost of [CRL] had found its way to companies and entities that benefitted Rowland and other parties." (Emphasis added). While this evidence again demonstrates Lacey's belief, it does not establish any fact that would cause a reasonable person to charge another with fraud or dishonesty.

13. The district court did not address this issue in its order granting Federal summary judg-

ment. Nevertheless, we may affirm summary judgment on an alternative ground to that given by the district court if the record fairly supports the alternative ground. *Fidelity Fin. Corp. v. Fed. Home Loan Bank,* 792 F.2d 1432, 1437 (9th Cir.1986).

14. Idaho law provides that "[a] contract of insurance, and the liability of an insurer, may be avoided by reason of fraud in the inception of the contract, or a concealment, or a misstatement of matters material to the risk." *Matthews v. N.Y. Life Ins. Co.,* 92 Idaho 372, 443 P.2d 456, 460 (1968); *see also* I.C. § 41–1811.

assessing summary judgment for Federal, we conclude that material issues of fact exist as to whether Gulf suffered a material loss on the Kidderminster transaction. If Gulf did not suffer a material loss on the Kidderminster transaction—as it claims— then its failure to mention the transaction in the renewal application does not constitute a material misrepresentation or omission such that the Crime Policy should be rescinded.

The record reveals the following. An outside auditor delivered a preliminary report to the Audit Committee of Gulf's Board of Directors dated February 26, 1992, which stated: "The exchange of CRL's Kidderminster property . . . to Inoco resulted in no material gain or loss." We find highly relevant that an independent auditor reported no material gain or loss resulting from the Kidderminster transaction. Additionally, Gulf filed two separate forms with the Securities and Exchange Commission ("SEC") claiming no material gain or loss. Gulf's Form 8–K filed with the SEC stated:

> The effect of this transaction completes an exchange by CRL of certain real estate property located in the United Kingdom [Kidderminster] with the Registrant's former largest shareholder in exchange for approximately 22.6 percent (valued at approximately $16 million) of the outstanding shares of Nycal, currently the owner of approximately 44 percent of the outstanding Common stock of the Registrant. There was no material gain or loss on the exchange transaction.

Similarly, Gulf's Form 10–K filed with the SEC for the fiscal year ending December 31, 1991 stated:

During the first quarter of 1991, under the direction of former directors, Gulf Pacific purchased a property in the United Kingdom Midlands, and in the opinion of Gulf Pacific's current Board of Directors, this development property did not fulfill Gulf Pacific's investment criteria. In October 1991, Gulf Pacific completed the exchange of this property with Inoco, formerly Gulf's largest shareholder, for 3,953,700 shares of Nycal Corporation Common Stock. There was no material gain or loss at the time of the exchange.

This evidence indicates that Gulf did not suffer a material loss on the Kidderminster transaction.

Notwithstanding the auditor's statements and the securities disclosures indicating no material loss on the Kidderminster transaction, there is evidence to the contrary. For example, Gulf's proof of loss to Federal stated that despite the settlement of its claims against Rowland, "Gulf and [CRL] nevertheless suffered significant loss."

There is a genuine issue of material fact whether Gulf actually suffered a material loss from the Kidderminster transaction.[15] We hold that summary judgment on the issue of rescission of the Crime Policy is inappropriate.

## V

■ As a second alternative basis for affirming the district court's grant of summary judgment, Federal argues that Gulf breached the Crime Policy's subrogation clause by granting Rowland a general release of liability.[16] Again, material issues of fact preclude summary judgment.

---

**15.** We express no opinion whether there may be other factual or legal issues pertinent to Federal's rescission theory.

**16.** The Crime Policy provides that "[t]he Insured shall do nothing after loss to prejudice [the Company's subrogation] rights."

As previously explained, the subject release was the product of a series of settlement negotiations that occurred in August and September 1991 between Lacey and Rowland after Lacey uncovered what he suspected to be fraudulent transactions perpetrated by Rowland. Gulf's release provided, in pertinent part:

> In consideration of the release to be given to it under this clause by [Inoco], [Gulf] for itself and on behalf of each of its subsidiaries (except [CRL] and its subsidiaries) ... hereby waives and releases [Inoco] and each of its subsidiaries and each of [Inoco's] officers from all claims ... liabilities, duties, debts and obligations owed or alleged to be owed to [Gulf] as at 30 September 1991 or in respect of any period ended on or prior to that date by [Inoco] or any officer or subsidiary of [Inoco].

CRL granted Inoco an identical release on its behalf.

There is some evidence in the record that might indicate that the Gulf officers and directors involved in negotiating the settlement intended broadly to release Inoco and its officers—including Rowland and the Rowland Group. However, the scope of the release is affected by the intent of the parties and the factual record here has not been fully developed.

But even if the parties intended to grant a broad release, summary judgment is nevertheless inappropriate. Gulf argues that under English law,[17] a provision in a contract that seeks to release a director from claims of misfeasance is void as a matter of statute. Section 310 of the Companies Act of 1985 provides that "any provision ... in any contract with the company or otherwise," which purports to exempt a director from liability for "negli-gence, default, breach of duty or breach of trust" in relation to an English company, is void. While the Companies Act of 1985 expressly applies to English companies, courts must construe the release in accordance with English law. The statute appears to apply here—despite Gulf's incorporation in the United States.[18]

English common law provides that releases will not be construed to apply to facts of which the releasing party is unaware at the time of entering the agreement. *See Ecclesiastical Comm'n for England v. N.E. Ry,* 4 Ch.D. 845 (1877) (holding that release did not bar plaintiff's claim because plaintiff had no ground to suspect that act complained of had taken place when giving release). As we held above, the record does not conclusively establish whether Gulf had sufficient facts to determine the fraudulent nature of the New Zealand acquisitions when it agreed to release Inoco and the Rowland Group.

To the extent that Gulf was unaware of the fraud allegedly committed by the Rowland Group in connection with the New Zealand acquisitions, English law appears to provide that the release does not operate to preclude such claims. We hold that material issues of fact preclude summary judgment on this issue.

**REVERSED, and REMANDED.**

---

17. The release explicitly states that "[t]his agreement shall be governed by and construed in accordance with English law."

18. In the present posture of the case, we need not find that English law is in fact applicable; this is an issue for the district court to determine in the first instance.